IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| PATRICE M. TIVIS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 05-0622-CV-W-NKL |
| | ) |
| JO ANNE B. BARNHART, | ) |
| Commissioner of Social Security | ) |
| | ) |
| Defendant. | ) |
| | ) |

ORDER

Pending before the Court is Plaintiff Patrice M Tivis's ("Tivis") Motion for Summary Judgment [Doc. # 12]. Tivis's application for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401, et seq., was initially denied on December 28, 2001. (Tr. 28-31.) She challenged that decision, and on September 16, 2003, following a hearing, an administrative law judge (ALJ) found that Plaintiff was entitled to a closed period of disability from June 28, 2000 through October 26, 2001, but was no longer under a "disability" as defined in the Social Security Act after October 26, 2001. (Tr. 16-24.) On June 24, 2005, the Appeals Council of the Social Security Administration denied Tivis's request for review. (Tr. 7-9.) Thus, the decision of the ALJ stands as the final decision of the Commissioner, and this Court has jurisdiction to review that decision under 42 U.S.C. § 405(g). The complete facts and arguments are

1

presented in the parties' briefs and will be duplicated here only to the extent necessary.[1]

Because the Court finds that the Administrative Law Judge's decision was supported by substantial evidence in the record as a whole, the Court affirms the ALJ's decision.

I.   **Factual Background**

   A.   **Scope of the Administrative Record**

As a preliminary matter, the Court must consider what evidence may be included in the administrative records. When her case came before the Appeals Council, Tivis introduced new evidence that had not been presented to the ALJ at the time he rendered his decision. The appeals council took this new evidence into consideration before it denied Tivis's Request for Review. (Tr. 10.) The Eighth Circuit has held that newly submitted evidence becomes part of the "administrative record" even though the evidence was not originally included in the ALJ's record. *Cunningham v. Apfel*, 222 F.3d 496, 500 (8th Cir. 2000). Thus, this Court will consider the entire record, including the evidence submitted after the ALJ rendered his decision, in determining whether that decision is supported by substantial evidence.

   B.   **Medical Records**

Tivis protectively filed her application for disability benefits under Title II on November 7, 2001. (Tr. 52-54.) She stated that she was born in 1958, and alleged that she became disabled beginning February 15, 2001. (Tr. 52.) In her Disability Report, she alleged disability due to a back injury. (Tr. 72.)

---

[1] Upon review of the record and the law, the Court finds the Defendant's position persuasive. Portions of the Defendant's brief are adopted without quotation designated.

2

Tivis saw Leon Herring on July 5, 2000, after injuring her back at work on June 28, 2000. (Tr. 118.) She reported pain radiating down her right leg. (Tr. 118.) Mr. Herring noted that Tivis could do a deep knee bend with some discomfort, and could forward flex with quite a bit of discomfort. (Tr. 118.) Tivis denied numbness in her legs. (Tr. 118.) Mr. Herring diagnosed sciatic type pain secondary to lifting and limited her to lifting no more than 15 pounds. (Tr. 118.) He noted that she should avoid repetitive bending, stooping, kneeling, and squatting. (Tr. 118.) Mr. Herring noted that she should be able to sit and stand as needed for pain control, should avoid ladders, and should sit no more than 20 minutes at a time. (Tr. 118.) Tivis returned with similar complaints on July 12, 2000. (Tr. 112.) Mr. Herring noted that it was necessary that she get up and move around every 20 minutes. (Tr. 112.) He reported that she could keep working with the same restrictions. (Tr. 113.) Tivis attended several physical therapy sessions during July, but her condition did not improve. (Tr. 105-06, 109, 114-16.)

On July 19, 2000, Tivis saw Marc Hutchison, M.D., for follow up of her radicular pain. (Tr. 107.) He diagnosed lumbar strain with radiculopathy. (Tr. 107.) Dr. Hutchison recommended Tivis have an MRI. (Tr. 107.) He noted that Tivis could continue working with a 15 pound weight limit, no sitting for more than 20 minutes, and no repetitive bending, stooping, squatting, or kneeling. (Tr. 108.) An MRI, performed on July 31, 2000, showed bilateral pars interarticularis defects at the L5-S1 level with anterior listhesis of L5 on S1. (Tr. 100.) There was no evidence of lumbar spinal stenosis. (Tr. 100.)

3

Tivis followed up with Nancy Ensley, M.D., on August 1, 2000, and reported no improvement in her symptoms. (Tr. 103.) Dr. Ensley noted that Tivis had a positive straight-leg raise test on the right. (Tr. 103.) She diagnosed Grade III spondylolisthesis and recommended referral to a spine surgeon. (Tr. 103.) Dr. Ensley noted that Tivis could continue to work with the same restrictions. (Tr. 104.)

On August 18, 2000, Tivis saw David Ebelke, M.D., for an evaluation of her radiating pain. (Tr. 192.) Tivis reported that she had continued working despite her pain. (Tr. 192.) Dr. Ebelke noted that Tivis could forward flex and had full motor strength in her extremities. (Tr. 192.) Straight-leg raise was mildly uncomfortable on the right. (Tr. 192.) Dr. Ebelke diagnosed a Grade II (almost Grade III) spondylolisthesis secondary to L5 spondylolysis. (Tr. 193.) He noted that she was limited to lifting no more than 20 to 25 pounds. (Tr. 193.) He recommended she undergo epidural injections. (Tr. 193.) Tivis underwent lumbar epidural steroid injections on August 30, 2000 and September 6, 2000. (Tr. 121-24.) Tivis returned to see Dr. Ebelke on September 19, 2000, and reported that the injections did not significantly help her pain. (Tr. 191.)

Tivis underwent a bone scan on October 10, 2000, which showed a fairly large area of abnormally increased activity centered at the L5-S1 disk space. (Tr. 129.) A myelogram performed on the same day showed moderate L5-S1 spondylolisthesis with resultant bilateral stenosis of the neural foramina. (Tr. 130.) There was also some bone hypertrophy that caused mild stenosis of the spinal canal. (Tr. 130.) Tivis continued to

see Dr. Ebelke and reported no improvement in her pain through February 2001. (Tr. 188-91.)

On February 15, 2001, Tivis was admitted to the hospital and underwent bilateral L5-S1 foraminotomies with complete L5 laminectomy/facetectomies and L5-S1 instrumented fusion. (Tr. 171-72.) Tivis underwent a second surgery on February 26, 2001, after developing some new pain. (Tr. 145-47.) Tivis was discharged on March 3, 2001, with instructions to follow up with Dr. Ebelke in two to three weeks. (Tr. 173.)

Tivis followed up with Dr. Ebelke on March 6, 2001. (Tr. 187.) Tivis's neurological examination was intact and she had full motor strength in her lower extremities. (Tr. 187.) Straight leg raise was normal. (Tr. 187.) Tivis returned on March 12, 2001, and reported some left radiculopathy. (Tr. 186.) Dr. Ebelke noted that Tivis had full motor strength in her lower extremities and that her X-rays looked good. (Tr. 186.) On April 9, 2001, Tivis reported that she had some left leg and foot pain and numbness. (Tr. 186.) She stated that she was doing a lot of walking, but could only walk about one half mile at a time. (Tr. 186.) Dr. Ebelke noted a normal gait, full motor strength in Tivis's lower extremities, and a normal straight-leg raise. (Tr. 186.) He recommended increased walking as tolerated, and noted that she needed to remain off of work. (Tr. 186.) On April 21, 2001, Tivis reported that she had been involved in a car accident and that her back pain had increased. (Tr. 185.) Dr. Ebelke recommended ice and rest. (Tr. 185.)

On June 11, 2001, Tivis reported that she was doing fairly well and that her left leg pain and numbness were improving. (Tr. 185.) Dr. Ebelke noted full strength in Tivis's lower extremities and normal straight-leg raise. (Tr. 185.) X-rays were normal. (Tr. 185.) Dr. Ebelke recommended Tivis increase her walking to twice a day with a goal of four to five miles a day. (Tr. 185.) On August 6, 2001, Tivis reported persistent back pain. (Tr. 185.) Dr. Ebelke noted full motor strength and normal straight-leg raise. (Tr. 185.) He reported that the X-rays looked very good. (Tr. 184.) On September 4, 2001, Dr. Ebelke noted that Tivis had a functional capacity evaluation done which showed that she was capable of light work. (Tr. 184.) He released her to light/medium work as of September 17, 2001, with a maximum lifting restriction of 35 pounds and a frequent lifting restriction of 15 to 20 pounds. (Tr. 184.) Dr. Ebelke recommended Tivis find a job that would allow her to alternate positions and that she not stand, walk, or sit for more than two hours at a time. (Tr. 184.)

Tivis returned to see Dr. Ebelke on November 2, 2001, and reported pain across her back, below the knee, and in her left foot. (Tr. 182.) Dr. Ebelke noted some soreness in the back with no spasm. (Tr. 182.) Tivis had full motor strength in her lower extremities. (Tr. 182.) Dr. Ebelke noted that Tivis should continue with her light duty restrictions. (Tr. 182.) That same day Dr. Ebelke completed a work certification form. (Tr. 180.) He opined that Tivis could lift up to 35 pounds occasionally and 15 to 20 pounds repetitively, sit, stand/walk, bend, squat, and climb for 2 hours at a time for a total of 6 to 8 hours a day, and push or pull up to 50 pounds. (Tr. 180.)

6

On June 3, 2003, P. Brent Koprivica, M.D., examined Tivis. (Tr. 202-11.) Tivis reported that her activities included cooking, washing dishes, and cleaning the bathroom. (Tr. 207.) She stated that she walked 15 to 20 minutes at a slow pace for exercise. (Tr. 207.) Dr. Koprivica noted that Tivis had limited tolerance to sitting during the examination, and that she had some pain with regional light touch. (Tr. 208.) He noted no sensory dermatomal losses. (Tr. 208-09.) Dr. Koprivica opined that Tivis could lift 20 pounds occasionally and should not perform frequent or constant lifting. (Tr. 211.) He also noted that she should avoid frequent bending, pushing, pulling, twisting, or awkward postures of the lumbar spine. (Tr. 211.) Dr. Koprivica also opined that Tivis should be able to alternate positions at will with no more than 30 minutes in one position. (Tr. 211.)

Tivis underwent a lumbar spine MRI on April 24, 2004. (Tr. 215.) It showed Grade I-II L5-S1 spondylolisthesis, marked narrowing of the L5-S1 disk, no evidence of spinal stenosis, no abnormal areas of enhancement, and some edema surrounding the Schmorl node. (Tr. 215.) Tivis had a normal nerve conduction study on the same day. (Tr. 216.) A CT scan performed on July 6, 2004, showed minimal degenerative disk disease to the upper and mid lumbar spine region. (Tr. 213.) It also showed Grade II spondylolisthesis at L5-S1, severe bony encroachment of the right neural foramen, and at least moderate bony encroachment of the left neural foramen. (Tr. 213.) There was no evidence of central stenosis. (Tr. 213.)

Terry Cordray, M.S., C.R.C., C.C.M., performed a vocational assessment of Tivis on September 12, 2004. (Tr. 217-28.) Tivis reported that her daily activities included taking her children to school, visiting her mother, fixing meals, and dusting. (Tr. 224.) Mr. Cordray administered the Wide Range Achievement Test - Revised 3 (WRAT-R3) and the Wonderlic Personnel Test (WPT). (Tr. 225.) He noted that Tivis's score on the WPT would correlate to a WAIS IQ score of 71. (Tr. 225.) Mr. Cordray reported that people with similar scores are capable of using simple tools and equipment under consistent supervision. (Tr. 225.) He opined that Tivis may be employable but not placeable in the competitive market. (Tr. 227.)

On October 2, 2004, Dr. Koprivica amended his previous opinion after reviewing Cordray's vocational assessment of Tivis. (Tr. 229-30.) He opined that Tivis was permanently and totally disabled. (Tr. 230.) Dr. Koprivica also noted that he would not materially change any of the opinions he previously expressed. (Tr. 230.)

### C. Administrative Hearing

At the administrative hearing, held on August 11, 2003, Tivis testified that she lived in a two-story duplex. (Tr. 240.) She stated that she lived with her children who were 15 years old and 9 years old. (Tr. 240.)

Tivis testified that she injured her back in January 2000. (Tr. 241.) She stated that she had two back surgeries in February 2001. (Tr. 243.) Tivis testified that she had pain in her back every day. (Tr. 245.) She stated that her left leg became numb when she walked. (Tr. 245.) Tivis stated that she had tingling in both legs. (Tr. 245.) She testified

8

that she did not have any problems with her hands or arms as a result of her back surgery. (Tr. 247.) Tivis testified that she had trouble sleeping. (Tr. 248.) When asked about her abilities, Tivis testified that she could lift 10 pounds. (Tr. 249.) She stated that she could walk a block and stand for 30 minutes. (Tr. 250.) When asked about her activities, Tivis testified that she cooked and washed dishes. (Tr. 240.) She stated that she did laundry and ironed. (Tr. 241.) Tivis testified that she went to the grocery store. (Tr. 241.)

A medical expert, Jim David Christian, Jr., M.D., also testified at the hearing. (Tr. 252.) Dr. Christian testified that Tivis's physical findings after her surgery were normal. (Tr. 254.) He opined that Tivis did not meet or equal any of the Listings. (Tr. 257.) Dr. Christian opined that Tivis would have been incapable of working for six to eight months after her surgery. (Tr. 258.) He opined that, after that period, she should have been able to return to work with no restrictions. (Tr. 258.)

Vocational expert, Lisa Keene, also testified at the hearing. (Tr. 265.) The ALJ asked Ms. Keene to assume a hypothetical person of Tivis's age with the same education and work experience. (Tr. 267.) She could perform sedentary work. (Tr. 267.) This individual should avoid frequent bending at the waist, perform limited pushing and pulling, and do no job that requires twisting of the lumbar spine. (Tr. 268.) She could not perform frequent or constant lifting. (Tr. 268.) The individual could occasionally stoop, kneel, crouch, or crawl, and perform only limited climbing. (Tr. 268.) She would be limited to low stress, noncomplex jobs with no supervisory responsibility. (Tr. 268.) This individual also required a job with a sit/stand option. (Tr. 271.) In response to the

9

ALJ's hypothetical question, the vocational expert testified that such an individual could not perform any of Tivis's past relevant work. (Tr. 268.) The vocational expert testified that such an individual could perform other work such as cashier, surveillance system monitor, and electronic assembler. (Tr. 271.)

## II. Discussion

The issue before the Court is whether the final decision of the Commissioner is consistent with the Social Security Act, regulations, and applicable case law, and whether the findings of fact are supported by substantial evidence on the record as a whole. Specifically, the Court must consider (1) whether the ALJ properly determined that Tivis did not meet or equal the Commissioner's Listing at 20 C.F.R. Pt. 404, Subpt. P, App. 1 §12.05C; (2) whether the ALJ properly evaluated Tivis's credibility; (3) whether the ALJ's residual functional capacity (RFC) determination is supported by substantial evidence; and (4) whether the ALJ properly relied on the vocational expert's testimony in finding Tivis not disabled.

### A. Standard of Review

Judicial review of the Commissioner's final decision under 42 U.S.C. § 405(g) is limited to whether there is substantial evidence in the record as a whole to support the decision of the Commissioner. *See* 42 U.S.C. § 405(g); *Lawrence v. Chater*, 107 F.3d 674, 676 (8th Cir. 1997); *Siemers v. Shalala*, 47 F.3d 299, 301 (8th Cir. 1995). When supported by substantial evidence, the Commissioner's findings are conclusive and must be affirmed. *See Holley v. Massanari*, 253 F.3d 1088, 1091 (8th Cir. 2001). Substantial

evidence is more than a scintilla, but less than a preponderance. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is such relevant evidence as a reasonable person might accept as adequate to support a decision. *Id.; Onstead v. Sullivan*, 962 F.2d 803, 804 (8th Cir. 1992). The court's role is "not to reweigh the evidence or try the issues de novo." *See Harris v. Shalala*, 45 F.3d 1190, 1193 (8th Cir. 1995). Questions of fact, including the credibility of a claimant's subjective testimony, are primarily for the Commissioner to decide, not the courts. *See Benskin v. Bowen*, 830 F.2d 878, 882 (8th Cir. 1987).

### B. Burden of Proof

The Commissioner's regulations governing determinations of disability set forth a five-step sequential evaluation process which the Commissioner must use in assessing disability claims. *See* 20 C.F.R. § 404.1520 (2005). A claimant has the burden of proving disability by establishing a physical or mental impairment which will persist for at least twelve consecutive months and prevents the claimant from engaging in substantial gainful activity. *See Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); 42 U.S.C. §§ 416(I), 423(d)(1)(A), 1382c(a)(3)(A). If a claimant establishes that she is not able to return to her past relevant work, the burden of proof shifts to the Commissioner to show that the claimant can perform work existing in significant numbers in the national economy. *See Lowe v. Apfel*, 226 F.3d 969, 974 (8th Cir. 2000); 20 C.F.R. § 404.1560 (2005). The Commissioner may meet this burden by relying on the Medical-Vocational Guidelines ("Grids") or vocational expert testimony.

### C. The Commissioner's Decision

The ALJ found that Tivis was disabled from June 28, 2000 through October 26, 2001. (Tr. 17.) The ALJ found that, after October 26, 2001, Tivis had the severe impairments of status post two back surgeries. (Tr. 21.) The ALJ determined that Tivis's impairments did not meet or equal any of the Commissioner's listings of impairments. (Tr. 18.) He determined that, after October 26, 2001, Tivis had the RFC to perform sedentary work with no frequent bending at the waist and a limited ability to push and pull. (Tr. 21.) The ALJ found that Tivis could not twist the lumbar spine or engage in frequent or constant lifting. (Tr. 21.) The ALJ also found that Tivis could occasionally stoop, kneel, crouch or crawl, and could only climb on a limited basis. (Tr. 21.) He determined that Tivis required a low stress, noncomplex job with no fixed quotas or supervisory responsibilities. (Tr. 21.) After determining that Tivis could not return to her past relevant work, the ALJ relied on vocational expert testimony and found that Tivis could perform other work which existed in significant numbers in the economy. (Tr. 22.) Therefore, he determined that Tivis was not under a disability as defined by the Social Security Act as of October 27, 2001. (Tr. 22.)

### D. Argument

  **1. The ALJ Properly Found that Tivis's Impairments did not Meet or Equal the Commissioner's Listing at 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.05C**

Tivis argues that she meets or equals the requirements of the Commissioner's Listing at 20 C.F.R. Pt. 404, Subpt. P, App. 1 §12.05C (Listing 12.05C). (Pl.'s Br., pp. 18-23.) Listing 12.05C provides:

> Mental retardation: Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
>
> . . .
>
> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work related limitation of function.

20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.05C. The only evidence related to Tivis's IQ is Mr. Cordray's statement that Tivis's performance on the WPT would correlate to an IQ score of 71. (Tr. 225.) Assuming that is a valid IQ score, it does not fall in the range required by Listing 12.05C. The record does not contain any evidence that Tivis had a verbal, performance or full scale IQ score of 60 through 70. As the Supreme Court stated, "For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria." *Sullivan v. Zebley*, 493 U.S. 521, 530, 110 S. Ct. 885, 891 (1990) (emphasis in original); *see also Marciniak v. Shalala*, 49 F.3d 1350, 1353 (8th Cir. 1995) (quoting *Zebley*). Therefore, Tivis does not meet Listing 12.05C.

Tivis argues that her case is similar to that of the plaintiff in *Shontos v. Barnhart*, 328 F.3d 418 (8th Cir. 2003), and that her condition is equivalent to Listing 12.05C (Pl.'s

Br., p. 20.) In *Shontos*, the plaintiff had no past relevant work. *Id.* at 420. In contrast, Tivis has an extensive work history including work as a stock clerk, trash pickup worker, laborer for the City of Kansas City, personal care attendant, and maintenance crew worker for the Missouri Department of Transportation. (Tr. 222-23.) The Supreme Court has recognized strict requirements for a claimant to show that she equaled a listing. *See Zebley*, 493 U.S. at 531, 110 S. Ct. at 891 (to prove she has an impairment equivalent to a listed impairment, claimant must "present medical findings equal in severity to *all* the criteria" for the most similar listing). Tivis has not shown evidence that her impairments are equivalent in severity to those required by Listing 12.05C.

## 2. The ALJ Properly Analyzed Tivis's Credibility

Tivis argues that the ALJ erred in his determination of her RFC. (Pl.'s Br., pp. 25-34.) However, before a claimant's RFC can be assessed, the ALJ must evaluate the credibility of her statements. *See Ellis v. Barnhart*, 392 F.3d 988, 995-96 (8th Cir. 2005). In applying the factors set forth in *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984), to analyze a claimant's subjective complaints of pain, an ALJ is required to examine: (1) the claimant's daily activities; (2) the duration, frequency and intensity of pain; (3) dosage, effectiveness, and side effects of medication; (4) precipitating and aggravating factors; and (5) functional restrictions. *See also Lowe v. Apfel*, 226 F.3d 969, 971-72 (8th Cir. 2000) (citing *Polaski,* 739 F.2d at 1321-22). An ALJ may discount a claimant's subjective complaints of pain only if there are inconsistencies in the record as a whole. *See Johnson v. Chater*, 87 F.3d 1015, 1017 (8th Cir. 1996); *Brown v.*

*Chater*, 87 F.3d 963, 965 (8th Cir. 1996). In this case, the ALJ noted several inconsistencies in the record. Tivis's physicians stated that she could perform activities consistent with work. (Tr. 20.) Dr. Ebelke, Tivis's treating physician, released her to work as of September 17, 2001. (Tr. 184.) He stated that she could lift up to 35 pounds with frequent lifting restricted to 15 to 20 pounds. (Tr. 184.) He also recommended she be allowed to alternate positions and not stay in one position for more than two hours at a time. (Tr. 184.) Consultive physician, Dr. Koprivica, stated that Tivis could lift up to 20 pounds but should not perform frequent lifting. (Tr. 211.) He noted that she should avoid frequent bending, pushing, pulling, twisting, and awkward positions of the lumbar spine. (Tr. 211.) Dr. Koprivica stated that Tivis should alternate positions at no less than 30 minute intervals. (Tr. 211.) Dr. Christian testified that Tivis would have been able to return to work with no restrictions six to eight months after her surgery. (Tr. 258.) Under these circumstances, it is significant that no physician who examined Tivis has found limitations consistent with disability. *See Young v. Apfel*, 221 F.3d 1065, 1069 (8th Cir. 2000) (citing *Brown v. Chater*, 87 F.3d 963, 964-65 (8th Cir. 1996) (lack of significant restrictions imposed by treating physicians supported the ALJ's decision of no disability)).

The objective medical evidence does not support Tivis's allegations of disability. (Tr. 20.) Dr. Ebelke repeatedly noted that Tivis had full motor strength in her lower extremities and normal straight-leg raise examinations. (Tr. 182, 185-86.) He also noted that her X-rays looked good. (Tr. 184-86.) Dr. Koprivica noted no sensory dermatomal

15

losses. (Tr. 208-09.) Dr. Christian testified that Tivis's physical findings were normal after her surgery. (Tr. 254.) The ALJ properly considered the lack of objective medical evidence to support Tivis's allegations of continued disability. *See Forte v. Barnhart*, 377 F.3d 892, 895 (8th Cir. 2004) ("[L]ack of objective medical evidence is a factor an ALJ may consider."). The ALJ also noted that Tivis did not experience any side effects from her medication and did not attend physical therapy after October 27, 2001. (Tr. 20.)

There is substantial evidence to support the ALJ's decision that Tivis was not a credible witness.

### 3. The ALJ's RFC Determination is Supported by Substantial Evidence.

Tivis argues that the ALJ's RFC determination is not supported by substantial evidence. (Pl.'s Br., pp. 25-34). RFC is what a claimant can still do despite her limitations. *See* 20 C.F.R. § 404.1545(a) (2005). It is an assessment based upon all of the relevant evidence including a claimant's description of her limitations, observations by treating and examining physicians or other persons, and medical records. *See* 20 C.F.R. § 404.1545(a). The responsibility for determining a claimant's RFC lies with the ALJ. *See* 20 C.F.R. § 404.1546(c) (2005). As the foregoing credibility analysis indicates, the ALJ considered the entire record and his RFC determination is supported by substantial evidence. For example, the ALJ found that Tivis could perform sedentary work, which requires lifting no more than 10 pounds. (Tr. 21.) This is more restrictive than Dr. Koprivica's opinion that she could lift up to 20 pounds and Dr. Ebelke's opinion that she could lift up to 35 pounds. (Tr. 184, 211.) The ALJ also found that Tivis required a

16

sit/stand option, which is consistent with the physician opinions. (Tr. 184, 211.) The ALJ's RFC determination is supported by substantial evidence.

Tivis argues that the ALJ erred in failing to include in the RFC determination limitations related to borderline intellectual functioning and pain. (Pl.'s Br., pp. 25-34.) The ALJ limited Tivis to low stress, noncomplex occupations with no supervisory responsibilities. (Tr. 21.) While the ALJ did not have Mr. Cordray's report, his RFC still accommodates a person with borderline intellectual functioning. *See Howard v. Massanari*, 255 F.3d 577, 582 (8th Cir. 2001) (describing a claimant as capable of doing simple work in a hypothetical question to the vocational expert adequately accounts for the finding of borderline intellectual functioning). As for Tivis's allegations of pain, the ALJ found she was limited to sedentary work, required a sit/stand option, and was unable to perform frequent postural activities. All of these limitations reflect Tivis's allegations of pain to the extent the ALJ found they were credible.

### 4. The ALJ Properly Relied on Vocational Expert Testimony to Find Tivis Not Disabled

Tivis also argues that the ALJ erred in failing to include limitations related to borderline intellectual functioning and pain in his hypothetical question to the vocational expert. (Pl.'s Br., pp. 34-37.) In the hypothetical question to the vocational expert, the ALJ noted that the individual was limited to a job that was "low stress, noncomplex, no fixed quotas . . . no supervisory responsibility." (Tr. 268.) As noted above, the limitation to noncomplex work accounts for a finding of borderline intellectual functioning. As for Tivis's allegations of pain, the ALJ need only include the limitations supported by the

record as a whole in his hypothetical question to the vocational expert. *See Goff v. Barnhart*, 421 F.3d 785, 794 (8th Cir. 2005). Again, as noted above, the ALJ included several limitations in his hypothetical question to the vocational expert which related to Tivis's allegations of pain, including a sit/stand option.

The vocational expert's testimony supported the ALJ's determination that Tivis was not disabled. Asked a hypothetical question which set forth Tivis's limitations in a manner consistent with the ALJ's eventual findings concerning Tivis's condition and functional limitations, the vocational expert testified that Tivis could perform other work available in significant numbers in the local and national economy. (Tr. 271.) This constitutes substantial evidence to support the ALJ's decision that Tivis could perform work available in the economy and, therefore, was not disabled.

## III. Conclusion

Accordingly, it is hereby

ORDERED that Tivis's Motion for Summary Judgment [Doc. # 12] is DENIED. The Decision of the Commissioner is AFFIRMED.

s/ Nanette K. Laughrey<br>
NANETTE K. LAUGHREY<br>
United States District Judge

Dated: May 15, 2006
Jefferson City, Missouri

18